**SO ORDERED: April 26, 2007.**



**James K. Coachys**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BRENDA K. DELBECQ, | ) | Case No. 06-04785-JKC-7 |
| | ) | |
| Debtor. | ) | |

## ORDER DENYING MOTION TO DISMISS

This matter came before the Court on the United States Trustee's (the "Trustee") Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) (the "Motion"). Following a hearing on January 9, 2007, the Court requested that the parties file post-hearing briefs. Those briefs having been filed, the Court now issues the following Order.[1]

## Facts and Procedural History

Debtor Brenda K. Delbecq ("Debtor") filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on August 18, 2006. At the time of her filing, she was employed, and continues to be employed, as an elementary school teacher for Indianapolis Public

---

[1] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

Schools with an annual gross income of $47,412. With her petition, Debtor filed Form B22A, which sets forth her "current monthly income" and included a "means test" calculation. Debtor represented on the face of Official Form B22A that the "presumption of abuse" had arisen in her case because, according to the means test, she has disposable income of approximately $306 per month. Based on that representation, the Trustee filed its Motion under § 707(b).

The evidence before the Court indicates that Debtor made $47,412 in 2006. She has student loans in the approximate amount of $21,000, with a current monthly payment of approximately $327. Debtor briefly deferred her loan payment in 2006. Prior to the deferral, her loan payment was $350, and the payment is soon expected to return to that amount. At her current rate of repayment, she will pay off the loan–which earns interest at the rate of nine percent per annum–in a little over six years. Debtor has approximately $35,000 in other general unsecured debts, mostly consumer debt in the form of credit card balances.

### Discussion and Decision

As amended by the Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA"), section 707(b)(1) provides that a Chapter 7 case filed by an individual whose debts are primarily consumer debts may be dismissed or, with a debtor's consent, converted to Chapter 11 or 13, if the Court determines that the granting of relief would be an abuse of Chapter 7. The Code specifies that for debtors above the median household income for their state, the court shall presume abuse exists if the debtor's gross income and disposable income exceed certain threshold amounts. 11 U.S.C. § 707(b)(2). The calculations set forth in § 707(b)(2) establishing those threshold amounts constitute what is commonly known as the "means test." *In re Johnson*, 346 B.R. 256, 259-60 (Bankr.S.D.Ga.2006). Under the means test, abuse is presumed "if the debtor's current monthly

2

income[2] reduced by the amounts determined under clauses (ii), (iii) and (iv) [of § 707(b)(2)(A)] and multiplied by 60 is not greater than the lesser of 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or $10,000."  11 U.S.C. § 707(b)(2)(A)(i).[3]

As indicated above, Debtor admitted on Form B22A that the presumption of abuse arises in her case.  In response to the Trustee's Motion, however, Debtor argues that the presumption of abuse does not, in fact, arise.  More specifically, she contends that her monthly student loan payment of $350 should be treated as an "other necessary expense" in determining her monthly disposable income pursuant to § 707(b)(2)(A)(ii)(I).  That section provides in relevant part that "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides . . . ."

In support of her argument, Debtor directs the Court to Chapter 5.15.1.10 of the Internal Revenue Manual.  According to the Manual "other necessary expenses" includes student loans if they are secured by the federal government and used only for the taxpayer's education.  Debtor's student loans do appear to qualify in that regard.  However, in making her argument, Debtor wholly ignores that portion of § 707(b)(2)(A)(ii)(I) which indicates that "other necessary expenses" "shall not include any payments for debts."  Thus, regardless of the standards used by the Internal Revenue Service, the Code dictates that Debtor's student loan payments cannot constitute an "other necessary

_____

[2]  "Current monthly income" is defined by 11 U.S.C. § 101(10A) as "the debtor's average monthly income for the six calendar months prior to the filing of the bankruptcy case."

[3]  For a more detailed explanation of the mechanics of means testing, *see e.g., In re Batzkiel*, 349 B.R. 581 (Bankr.N.D.Iowa 2006).

expense." It appears, then, that the presumption of abuse applies in Debtor's case.

In the alternative, Debtor attempts to rebut the presumption of abuse by arguing that her student loan payment constitutes "special circumstances" pursuant to § 707(b)(2)(B). That section provides:

> [T]he presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call to active duty in the Armed Forces, to the extent such special circumstances that [sic] justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.
> (ii) in order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide–
> (I) documentation for such expense or adjustment to income; and
> (II) a detailed explanation of the special circumstances that makes such expenses or adjustment to income necessary and reasonable.
> (iii) the debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.
> (iv) the presumption of abuse may only be rebutted if the additional expense or current monthly income reduced by the amounts determined under clauses (ii), (iii) and (iv) of subparagraphs (A) when multiplied by 60 to be less than the lesser of–
> (I) 25 percent of the debtor's nonpriority unsecured claims, or $6,000, which ever is greater; or
> (II) 10,000.

Clearly, the merits of Debtor's argument turn on the meaning of "special circumstances" as used above. All statutory interpretation begins with the language of the statute itself, and where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). A court should look to legislative history only when the statute is ambiguous or when the application of the statute's plain meaning produces a result demonstrably at odds with the intention of the drafters. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103

4

L.Ed.2d 290 (1989).

Certainly, the plain meaning of "special"[4] provides some instruction to the Court that the expense or adjustment to income in question must be out of the ordinary or exceptional in some way. However, given the myriad of possible scenarios–from the exceedingly rare to the slightly unusual–it is difficult for the Court to discern exactly what Congress intended by its use of the word. As such, the Court finds the term "special circumstances" to be ambiguous and, therefore, turns to § 707(b)'s legislative history for additional guidance. The Supreme Court has repeatedly stated that "[i]n surveying legislative history . . . the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those [Members of Congress] involved in drafting and studying proposed legislation.'" *Eldred v. Ashcroft*, 537 U.S. 186, 209 n.16, 123 S.Ct. 769 (2003) (quoting *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969))).

The concept of "special circumstances" was first introduced to the means test in 1999, per Senate Bill 625. In reporting favorably on the bill, the Senate Judiciary Committee explained that "[t]he bankrupt can rebut this presumption [of abuse] by demonstrating 'special circumstances' which would show that the bankrupt in fact does not have a meaningful ability to repay his or her debts." S. REP. NO. 106-49, at 2 (1999). The Report further states:

> In order to protect debtors from rigid and arbitrary application of a means-test, section 102 also provides that in some cases where the presumption applies the debtor may be able to demonstrate "special circumstances" that justify additional

---

[4] Webster's New Twentieth Century Unabridged Dictionary (2nd ed. 1962) defines "special" in relevant part as "unusual, uncommon, exceptional, extraordinary, differing from others, distinctive, peculiar, or unique."

expenses or an adjustment to the debtor's income. The Committee adopted the "special circumstances" standard, rather than the "extraordinary circumstances" standard included in the Conference Report to accompany H.R. 3150 to provide a different standard of when a debtor may overcome the presumption of abuse.

In applying the "special circumstances" test, it is important to note that a debtor who requests a special circumstances adjustment is requesting preferential treatment when compared to other consumers, and it is those other consumers who, by paying their debts, must assume the cost of the debts discharged by the debtors seeking the preferential treatment.  In order to ensure fairness with respect to the consumers who must pay the cost when others discharge debts in bankruptcy, it is essential that the "special circumstances" test establish a significant, meaningful threshold which a debtor must satisfy in order to receive the preferential treatment.  The debtor's ability to overcome the presumption of abuse must be based solely on financial considerations (i.e., adjustments to income or expenses required by special circumstances) and not on factors unrelated to a chapter 7 debtor's ability to repay his or her debts.  The Committee believes that the relief sought by a debtor who files for bankruptcy is financial in nature and the debtor's right to obtain preferential relief under the special circumstances provision should be assessed based on financial considerations only.  In addition, special circumstances adjustments must not be used as a convenient way for debtors to choose a more expensive lifestyle. The special circumstances provision must be reserved only for those debtors whose special circumstances require adjustments to income or expenses that place them in dire need of chapter 7 relief.

Under S. 625, a legal presumption arises that a chapter 7 bankrupt should be dismissed from bankruptcy or converted to chapter 13 if, after taking into account secured debts and priority debts like child support as well as living expenses, the bankrupt can repay 25 percent or more of his general unsecured debts, or $15,000, over a 5-year period.  The bankrupt can rebut this presumption by demonstrating "special circumstances" which would show that the bankrupt in fact does not have a meaningful ability to repay his or her debts.

* * * * *

The new section 707(b) . . . contains a tightly-focused mechanism for identifying bankrupts who have repayment capacity and sorting them out of chapter 7.  At the same time, the new section 707(b) contains numerous procedural safeguards in order to ensure that the individual circumstances of each bankrupt will be considered before he or she is dismissed or converted to chapter 13.

*Id.*, at 6-8.

The Report strongly suggests to the Court that the term "special circumstances" requires a

fact-specific, case-by-case inquiry into whether the debtor has a "meaningful ability" to pay his or her debts in light of an additional expense or adjustment to income not otherwise reflected in the means test calculation. *See In re Lenton*, 2006 WL 3850001 (Bankr.E.D.Pa.2006); *In re Thompson*, 350 B.R. 770 (Bankr.N.D.Ohio2006) (both holding that language of § 707(b)(2)(B) implies a fact-specific inquiry). The Trustee insists, however, that to qualify as "special circumstances" the expense or adjustment to income must rise to the same level as a "serious medical condition" or "active military duty."[5]

Contrary to the Trustee's argument, the legislative history does not indicate that the explicit examples included in § 707(b)(2)(B) were intended to define, qualify or otherwise limit the meaning of "special circumstances." Rather, the examples of "special circumstances"–added to the provision in 2005 by way of an amendment proposed by Senator Jeff Sessions of Alabama–were seemingly designed to explicitly protect military personnel from the effects of means testing. In support of the amendment, Senator Sessions stated in part: "I believe . . . that we can . . . make sure that soldiers, certain persons with medical conditions, and veterans with low income can qualify under the safe harbor of the bill. I am offering an amendment which clarifies that these individuals who may fall under the special circumstances provisions of the bill are explicitly allowed to be covered . . . ."[6]

---

[5] There are several reported cases that stand for this same proposition. *See In re Delunas*, 2007 WL 737763 at 2 (Bankr.E.D.Mo.2007) ("'Special circumstances' . . . should rise to the same level as [the statutorily recognized examples of] a serious medical condition or call to active duty.'") (quoting *In re Johns*, 342, B.R. 626, 629 (Bankr.E.D.Okla.2006)). Neither of these cases, however, cite to any direct authority for that proposition.

[6] The court in *In re Templeton*, 2007 WL 886010 (W.D.Okla. 2007), addressed a similar argument by the United States Trustee, i.e., that student loans "do not rise to the level of being beyond a debtor's control because debtors control their borrowing." The court "fundamentally reject[ed] this argument. As explained in *In re Thompson*, 'It should be noted that in neither example in the Bankruptcy Code are the "special circumstances" necessarily of an entirely involuntary nature. The serious health condition could stem from self-inflicted injury, and an individual called to active duty could have voluntary enlisted as a reservist.'" *Templeton*, at 3 (citing *Thompson*, 350 B.R. at 777).

7

There is nothing further in the debate over the amendment to suggest that Congress otherwise intended such explicit protection to serve as a benchmark for defining "special circumstances."

Here, the evidence indicates that, because of her student loan payment, Debtor does not have a meaningful ability to pay her debts. Section 707(b)(2)(B) requires the Court to find that there is "no *reasonable* alternative" to the claimed expense. (Italics added). Given the evidence before the Court, it appears that Debtor's student loan is non-dischargeable. It further appears that if her case is dismissed, Debtor would likely be forced to defer repayment[7] of her student loan–thereby incurring additional indebtedness in the form of interest at nine percent–in order to pay off her other unsecured debts. Thus, even if she applies the $350 a month that she currently pays on her student loan to her credit card indebtedness, it would not only take her years to retire that debt, but she would find herself owing substantially more in student loans. The Court does not find this to be a reasonable alternative. *See Templeton*, at 2 (affirming bankruptcy court's finding that debtor did not have reasonable alternative to paying student loans in that loans were non-dischargeable and that debtors were not eligible for consolidations or deferment.)

Nor is conversion to Chapter 13 a reasonable alternative. In this jurisdiction, the Court has historically allowed debtors to classify separately student loan indebtedness pursuant to 11 U.S.C. § 1322(b)(5).[8]   If compelled to convert to Chapter 13, Debtor's plan would likely not provide a

---

[7]  The Court notes that Debtor deferred her loans briefly in 2006 and that it is not clear from the record whether she is, in fact, eligible for another deferment.

[8]  Code § 1322(b)(5) allows a debtor to "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." Both Chapter 13 trustees in this division and the United States Trustee for this jurisdiction have long permitted debtors to make ongoing student loan payments pursuant to this provision. Recently, an unsecured creditor challenged debtor's proposal to maintain student loan payments at the contract rate throughout the life of the plan, at the expense of other unsecured creditors. Per an unpublished opinion by Judge Frank J. Otte of this district, that

distribution to her general unsecured creditors, but would instead provide only for the ongoing

payment of her student loan. Moreover, given the administrative costs associated with Chapter 13,[9]

the payment on her student loan during the life of the plan would be less than what Debtor is

currently paying. It would seem, then, that the only parties who stand to benefit from conversion

are Debtor's attorney and the Chapter 13 trustee. This result can hardly be what Congress intended

by the means test.

The Trustee insists that in determining whether Debtor has rebutted the presumption of

abuse, the Court should not consider Debtor's inability to fund a Chapter 13 plan. Admittedly, there

are reported cases that have rejected the argument that the inability to fund anything other than a

"zero percent" plan constitutes "special circumstances." The debtors in *In re Castle*, 2006 WL

4085798 (Bankr.N.D.Ohio), faced a similar dilemma in that they received approximately $1,000 per

month in child support payments that were included in § 707(b)(2)(A)(i)'s computation of "current

---

objection was overruled. *See In re Collins*, Case No. 06-5301-FJO-13 (March, 22, 2007) (acknowledging
that the practice has been permitted by trustees locally).

　　Notwithstanding the above, this Court has not had an opportunity to rule on the propriety of this
practice and is reluctant to do so here. The Court acknowledges, however, that a number of other courts have
taken issue with the practice in light of Code § 1322(b)(1), which states that a plan can classify claims
separately so long as such classification does not discriminate unfairly. *See e.g., In re Pora*, 353 B.R. 247
(Bankr.N.D.Cal.2006) (listing additional cases); *In re Belda*, 315 B.R. 477 (N.D.Ill.2004); *In re Caruso*, 2001
WL 34076052 (C.D.Ill.). On appeal In *Belda*, the Seventh Circuit was asked to decide the issue, but then
ruled that the matter was moot when the debtor's underlying Chapter 13 case was involuntarily dismissed.
*See Belda v. Marshall (In re Belda)*, 416 F.3d 618 (7th Cir.2005). As such, the issue remains unsettled in this
circuit.

　　The Court, therefore, emphasizes that its conclusion that Debtor could seek and successfully obtain
confirmation of a plan which maintains payments on her student loan but pays nothing to her other unsecured
creditors is based on what is *likely* to happen in this jurisdiction if Debtor's case was converted to Chapter
13, not on what could conceivably happen if an unsecured creditor, the United States Trustee or Chapter 13
trustee were to object in this Court to Debtor's plan pursuant to § 1322(b)(1).

　　[9] The Chapter 13 administrative cost "multiplier" for this jurisdiction, as determined by the Office
of the United States Trustee, was seven percent as of the petition date. *See* **www.usdoj.gov/ust/eo/bapcpa.**
The standard "no look" attorney fee for Chapter 13s in this jurisdiction is currently $3,500.

monthly income" but excluded from § 1325(b)(2)'s computation of "disposable income" for purposes of funding a Chapter 13 plan. Thus, while they had excess income under § 707(b)'s means test, they were not required to devote the child support payments to fund their Chapter 13 plan. In addressing the debtors' argument that such facts constitute "special circumstances," the court stated:

> The issue as to whether a *de minimus* payout to unsecured creditors constitutes "special circumstances" under § 707(b)(2)(B)(i) has been previously addressed by another court, and answered with an uncompromising no. *In re Johns*, 342 B.R. 626, 629 (Bankr.E.D.Okla.2006). While the Court in *In re Johns* did not explain its reasoning in detail, it is hard to find any fallacy with it conclusion: that the "potential payback of zero percent to unsecured creditors in a Chapter 13 is not a special circumstances contemplated under § 707(b)(20(B)."
>
> Nothing in the Bankruptcy Code prohibits a debtor from submitting a Chapter 13 plan of reorganization having little or no value to unsecured creditors so long as it meets the Code's other requirements–e.g., having been proposed in good faith, § 1325(a)(3), meeting the best interests of creditors test of § 1325(a)(4). And while such plans are not favored, there exist[s] a logical disconnect that a "special circumstance" under the Bankruptcy Code could arise from a situation which the Code otherwise permits.

With all deference to its colleagues in Oklahoma and Ohio, the Court takes issue with the above reasoning. In applying § 707(b)(2)'s presumption of abuse, there is simply no logic to essentially forcing a debtor into a Chapter 13 case if the distribution in that case will yield nothing to unsecured creditors. In this Court's opinion, the administrative cost of Chapter 13 to the entire bankruptcy system alone makes such a result ill-advised. It is also consistent with Congressional intent.

Admittedly, bankruptcy protection and relief are not entitlements under the law. Nevertheless, the legislative debate over means testing suggests that Congress assumed that if the presumption of abuse could not be rebutted, then debtors would still be able to avail themselves of the relief offered by Chapter 13. The Congressional Record is replete with statements to this effect. In its report in favor of the legislation, the House Judiciary Committee stated that a "debtor who could not demonstrate 'special circumstances,' which would cause the expected disposable income

10

to fall below the threshold, could file under other chapters of the bankruptcy code." H.R. Rep. No. 109-31(I). The Senate Judiciary Committee similarly reported that "the concept of "means testing" bankruptcy filers so that higher income filers are steered into repayment plans is the culmination of many Congressional efforts, by Republicans and Democrats, over 5 decades. . . . The Committee recommends S. 625, which will steer individuals with repayment ability to Chapter 13, and promote balanced reform of the bankruptcy laws while providing important new protections against abusive or deceptive creditor practices." S. Rep. No. 106-49, at 2 (1999). With respect to needs-based reforms, Representative James Sensenbrenner, then Chair of the House Judiciary Committee, explained during floor debate that "S. 256 implements an income and expense analysis to determine whether a debtor has a demonstrated ability to repay a significant portion of his or her debts. If a debtor has the ability to repay debts, he or she must either be channeled into a form of bankruptcy relief that requires repayment or risk having the bankruptcy case dismissed as an abusive filing." 151 Cong. Rec. H1993-01, 2048-49 (daily ed. April 14, 2005). Senator Orrin Hatch, then Chair of the Senate Judiciary Committee, further argued in debate that "[s]ome have attempted to criticize the commonsense safeguard [of means testing] as somehow taking away bankruptcy protection. Let me be clear. The means test does no such thing. All it does is identify those who can repay at least some of their debts. It makes certain they enter into Chapter 13 reorganization and repayment plan rather than let them simply walk away from their obligations, no matter how steep or outrageous." 151 Cong. Rec. S1834-01 (daily ed. March 1, 2005).

In ruling on the Trustee's Motion, the Court cannot lose sight of the primary purpose behind § 707(b)(2)'s presumption–to weed out the most obvious instances of abuse. In the Court's opinion, then, the standard for special circumstances should not be set so high that it transforms § 707(b)(2)'s

11

*rebuttable* presumption into an *irrebuttable* one.  In this regard, it must be emphasized that the Court's inquiry under § 707(b) does not end with a finding that "special circumstances" exist. Section 707(b)(3) dictates that "[i]n considering under paragraph (1) whether the granting of such relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider whether the debtor filed the petition in bad faith; or the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."  11 U.S.C. § 707(b)(3).  In the Court's view, this provision will "catch" those debtors who are able to rebut the presumption of abuse by demonstrating "special circumstances" in their inability to fund a Chapter 13 plan but who nevertheless have a meaningful ability to pay their debts or who are otherwise abusing the bankruptcy system.[10]

Based on the foregoing, the Court concludes that because of her student loan, Debtor does not have a meaningful ability to repay her debts either outside of bankruptcy or under Chapter 13. and that she has rebutted § 707(b)(2)'s presumption of abuse by demonstrating "special circumstances."  While there are alternatives to making her student loan payment, the Court cannot conclude that such alternatives are *reasonable*.  Furthermore, there is no evidence to suggest that Debtor's petition was filed in bad faith or that abuse is apparent from the totality of the circumstances.[11]  As such, the Court cannot conclude that granting Debtor relief would be an abuse of Chapter 7.  The Trustee's Motion is, therefore, denied.

###

---

[10]  For instance, as applied to the fact pattern in *Castle*, the court could examine whether the child support payments were actually needed and used for the care of the debtor's dependent children.

[11]  It should be noted that based on the amounts listed in Schedule J, the Court cannot conclude, and the Trustee did not contend, that Debtor maintains an extravagant lifestyle.

12

Distribution:

Rodger K. Hendershot
United States Trustee